**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
**LINDA RAMSEUR,**                        )
                                          )
    **Plaintiff,**               )
                                          )
      **v.**                )      **Civil Action No. 13-0169 (ESH)**
                                          )
**THOMAS E. PEREZ, Secretary,**           )
**U.S. Department of Labor,**             )
                                          )
    **Defendant.**              )
_____)

**MEMORANDUM OPINION**

Plaintiff Linda Ramseur has brought this action against Thomas E. Perez, in his official capacity as the Secretary of the Department of Labor ("DOL"), alleging that she had been subjected to discrimination, retaliation, and a hostile work environment based on her race and sex. This Court initially granted in part and denied in part defendant's motion on the pleadings. *See* Fed. R. Civ. P. 12(c). Discovery is now complete, and defendant has filed for summary judgment. (Def.'s Corrected Mot. for Summ. J. and to Dismiss [ECF No. 30]; Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. [ECF No. 30] ("Def.'s Mot.").) For the reasons given herein, defendant's motion will be granted.

**BACKGROUND**

**I.    PLAINTIFF'S ALLEGATIONS**

**A.  GS-11 Staff Assistant Position**

When the events giving rise to this case occurred, plaintiff (African-American) was employed by the DOL as a Staff Assistant, GS-09, assigned to the Office of the Director in DOL's Civil Rights Center ("CRC"). (Compl. [ECF No. 1] ("Compl.") ¶ 6.) Ramón Suris

Fernandez (Hispanic) became the Director of the CRC in April 2008.  (Def.'s Mot., Ex. 1 [ECF No. 31-1] ("Suris-Fernandez Aff.") ¶¶ 3-4.)  Early in Mr. Suris-Fernandez's tenure, management expressed a desire to provide plaintiff with an opportunity to advance her career.  (Def.'s Statement of Material Facts as to Which There Is No Genuine Dispute [ECF No. 30] ("Def.'s SOF") ¶ 5; Suris-Fernandez Aff. ¶ 18.)  In October 2008, Julia Mankata-Tamakloe (African-American) – one of plaintiff's supervisors at the time – e-mailed Jackie Brooks (African-American) – a Human Resources (Developmental) Specialist – inquiring as to whether there existed a GS-11 Staff Assistant position into which plaintiff could be placed due to her accretion of duties.[1]  (Def.'s SOF ¶ 6; Def.'s Mot., Ex. 18 [ECF No. 32] ("2008 E-mail Exchange") at 3; Pl.'s Mem. of P. & A. Opposing Def.'s Mot. for Summ. J. [ECF No. 33-3] ("Pl.'s Opp.") at 4.) Brooks responded that no such position existed and that a position description ("PD") would have to be drafted and the position would have to be posted throughout the entire DOL.  (2008 E-mail Exchange at 3.)  Mankata-Tamakloe sent Brooks a position description for a GS-11 Staff Assistant position (the "Staff Assistant position") on November 21, 2008.  (*Id.* at 5.)  Mankata-Tamakloe's involvement in the creation of the position ended in December 2008.  (Pl.'s Opp., Ex. 5 [ECF No. 33-8] ("Mankata-Tamakloe Dep.") at 33.)

    In October 2008, Patricia Lamond (Caucasian) joined the CRC.  (Def.'s SOF ¶ 3; Def.'s Mot., Ex. 2 [ECF No. 31-1] ("Lamond Aff.") ¶¶ 3-4.)  In March 2009, Lamond became plaintiff's second-line supervisor, and Elvia Mata (Hispanic) became plaintiff's first-line supervisor.  (Def.'s SOF ¶¶ 3-4; Def.'s Mot., Ex. 4 [ECF No. 31-1].)  Lamond was also the

---

[1] Plaintiff disputes this fact, claiming that it is "contravened by the record."  (Mot. Pursuant to LCvR 7(b) Resp. in Opp. to Mot. for Summ. J. and Mot. to Dismiss by Def. and Contravening Def.'s Submission of Undisputed Material Facts and Pl.'s Submission of Undisputed Material Facts [ECF No. 33-1] ("Pl.'s Resp. to Def.'s SOF") ¶ 6.)  But she does not contest the fact that Mankata-Tamakloe sent the e-mail.  She merely points out the absence of a job analysis for the GS-11 Staff Assistant position.

second-line supervisor of Ken Willis (African-American), who was responsible for coordinating the Staff Assistant position recruitment action.[2]  (Def.'s SOF ¶ 7; Def.'s Mot., Ex. 5 [ECF No. 31-1] at 13.)  By January 2009, Lamond was communicating with Willis about the Staff Assistant position.  (Def.'s SOF ¶ 9; Def.'s Mot., Ex. 19 [ECF No. 32].)  In February 2009, Maria McAlpin – Jackie Brooks's supervisor – sent an e-mail to Willis, with Lamond and Brooks copied, stating "we are justifying a GS-11 level position so there must be some analytical and evaluation work included in this PD to support the grade."  (Def.'s Mot., Ex. 20 [ECF No. 32]; Def.'s Mot., Ex. 6 [ECF No. 31-1] at 15-16.)

On May 18, 2009, the DOL posted a vacancy announcement for the Staff Assistant position.  (Def.'s SOF ¶ 12; Def.'s Mot., Ex. 8 [ECF No. 31-1] ("Vacancy Announcement").)  The announcement contained the following requirement: "[C]andidates should demonstrate specialized experience in planning, implementing, or evaluating compliance and technical assistance activities related to recipients of Federal financial assistance; conducting EEO and EO investigations and non-discrimination statutes under Title VI and VII of the Civil Rights Act and related statutes."  (Vacancy Announcement at 3.)  The testimony is conflicting as to the identity of the requirement's author.  In her deposition, Jackie Brooks stated that "Patty Lamond [and] my direct supervisor, Maria McAlpin . . . worked together in formulating the specialized experience [requirement]."  (Pl.'s Opp., Ex. 7a [ECF No. 33-9] ("Brooks Dep.") at 77.)  Plaintiff likewise claims that Lamond and McAlpin inserted the requirement.  (Pl.'s Opp. at 11 ("[T]here can be no question that [Lamond] drew the requirement and was assisted by Personnel Officer

---

[2] Plaintiff "disputes the fact that Ken Willis was responsible for defining the special knowledge requirement" that eventually barred plaintiff from attaining the Staff Assistant position.  (Pl.'s Resp. to Def.'s SOF ¶ 7.)  Defendant, however, does not assert that Willis was responsible for drafting that language, and plaintiff puts forward no evidence to cast doubt on Willis's role as coordinator of the recruitment action.

McAlpin in doing so.").)  Although Lamond herself denies writing the requirement, defendant concedes that "Lamond . . . was ultimately responsible for reviewing the document, as a CRC manager."  (Def.'s SOF ¶ 19; *see* Lamond Aff. ¶¶ 37, 41.)  For purposes of this motion, the Court must assume that Lamond was the author.[3]

Shortly after the vacancy announcement was posted, plaintiff applied for the position, along with seven other individuals.  (Def.'s SOF ¶ 16; Def.'s Mot., Ex. 9 [ECF No. 31-1] ("Applicant Listing"); Def.'s Mot., Ex. 10 [ECF No. 32].)  All eight applicants were female; seven of the applicants identified as "Black or African American"; one applicant identified as "White."  (Pl.'s Opp., Ex. 25 [ECF No. 35-6].)  Jackie Brooks reviewed all eight applications and found that all of the applicants either lacked the specified qualifications or were ineligible for consideration.  (Def.'s SOF ¶ 17; Applicant Listing; Def.'s Mot., Ex. 7 [ECF No. 31-1] ("Brooks Aff.") ¶ 30.)  Brooks notified plaintiff that the reason she did not qualify for the position was because she "did not have the specialized experience that was required for the position," specifically that she did not meet the requirement that candidates "should demonstrate specialized experience in planning, implementing, or evaluating compliance and technical assistance activities related to recipients of Federal financial assistance; conducting EEO and EO investigations and non-discrimination statutes under Title VI and VII of the Civil Rights Act and

---

[3] Lamond has stated that she believed that plaintiff satisfied the requirement as written.  (Lamond Aff. ¶ 40 ("The operative language [in the requirement] is planning, implementing or evaluating . . . . [Plaintiff], in her capacity as Staff Assistant to the CRC Director, was involved – on a daily basis – in planning activities and supporting the implementation of CRC's programs.").) Plaintiff disputes this fact.  (Pl.'s Resp. to Def.'s SOF ¶ 14.)  Her only evidence is Lamond's statement that she gave plaintiff a project to help her qualify for the job.  (*Id.*; *see* Lamond Aff. ¶ 49 ("I also gave the Complainant at least one project and specifically told her that I considered it to be a developmental assignment that could assist her in being competitive for a higher-level position.").)  These two statements, however, are not in tension.  Indeed, Lamond's statement makes clear that she gave plaintiff a developmental assignment precisely because she "believed that [plaintiff] would be very competitive for the position."  (Lamond Aff. ¶ 49.)

related statutes."  (*See* Def.'s Reply in Supp. of Its Mot. for Summ. J. and to Dismiss [ECF No.

37] ("Def.'s Reply"), Ex. 25 [ECF No. 37-2] ("Brooks Nov. 19 E-mail").)  Plaintiff maintains

that the reason she did not qualify for the job was because of the requirement that applicants

have experience conducting EEO and EO investigations, which plaintiff contends was unrelated

to the duties of the position.  (*See* Compl. ¶¶ 35, 39, 50.)  No one was ever selected to fill the

Staff Assistant position, and the position was not re-posted.  (*See* Brooks Aff. ¶ 30; Def.'s Mot.,

Ex. 12 [ECF No. 32] at 74.)

## B.  2009 Performance Appraisal and Bonus

On November 5, 2009, plaintiff received a performance rating of "effective" for the

period from March 23, 2009 to October 30, 2009.  (Def. SOF ¶ 20; Pl.'s Opp., Ex. 3 [ECF No.

33-7] ("2009 Performance Review").)  Elvia Mata was plaintiff's direct supervisor during this

period and conducted the review; Patricia Lamond approved the performance assessment.

(Def.'s SOF ¶ 24; 2009 Performance Review; Def.'s Mot., Ex. 3 [ECF No. 31-1] ("Mata Aff.") ¶

17.)  Mata has stated that the rating of "effective" was based on plaintiff's "execution of

assignments," "customer service – showing cooperation with others," "display of tact, discretion,

and confidentiality," "ability to seek possible sources for information when it is not [readily]

available to her," "final product reflects information requested," and "accepting personal

responsibility for the quality of her work."[4]  (Def.'s SOF ¶ 21; Mata Aff. ¶ 20.)  Moreover, Mata

claims that, on at least six occasions between March and October of 2009, she spoke with

plaintiff "to discuss her progress towards goal attainment."  (Mata Aff. ¶ 18.)  For example, Mata

---

[4] Plaintiff asserts that this fact is in dispute.  (Pl.'s Resp. to Def.'s SOF ¶ 21.)  But plaintiff does
not challenge the basis for the rating; rather, she objects to CRC's procedure in giving her the
rating.  For example, she complains that "the supervisor Mata did not conduct a mid-year review
with the employee" and that "the employee was never provided an opportunity to submit
comments on the appraisal."  (*Id.*)  Even if plaintiff's allegations are accepted as true, they do not
contradict the reasons provided by Mata for the rating given.

claims that on July 13, 2009, she "spoke with complainant about her making copies of a book titled 'Lose Your Love Handles' on government property and distributing these copies to CRC staff including me." (*Id.*) And, on August 7, 2009, Mata claims that she "spoke with complainant regarding her tone of email sent to the Director and an employee regarding the Director's Travel Voucher." (*Id.*) Plaintiff does not dispute that these six discussions occurred. (Pl.'s Resp. to Def.'s SOF ¶ 22.)

The day before her initial review, which occurred on October 29, 2009, plaintiff sent Mata an e-mail that included documentation of her accomplishments. (Pl.'s Opp., Ex. 26 [ECF No. 35-6] ("Ramseur Oct. 28 E-mail").) Plaintiff sent Mata additional supportive documents the day after her review. (Pl.'s Opp., Ex. 29 [ECF No. 35-7] ("Ramseur Oct./Nov. E-mails").) Mata has stated that these additional submissions "did not support a higher rating." (Mata Aff. ¶ 27.) Plaintiff alleges that her review should have been amended to reflect her additional submissions, that she was not given an opportunity to submit comments before the appraisal was sent to the personnel office, and that she was not provided with a mid-year appraisal where she could have been informed that she needed to improve her performance. (Pl.'s Resp. to Def.'s SOF ¶ 21; Pl.'s Opp., Ex. 1 [ECF No. 33-6] ("Ramseur Decl.") ¶ 21.)

As a result of receiving a rating of "effective," plaintiff was not awarded a bonus for that performance period. (Def.'s SOF ¶ 20; Compl. ¶ 49; Pl.'s Opp., Ex. 8 [ECF No. 33-10] ("2009 Bonus List").) Pursuant to DOL's Departmental Personnel Regulation ("DPR") 430 subchapter 12 d.3.b, in effect at the time of plaintiff's rating, DOL monetary bonuses were tied to performance. (Def.'s SOF ¶ 25; Def.'s Mot., Ex. 23 [ECF No. 32] ("DPR").) The DPR stated that employees receiving a rating of "exemplary" "must receive a performance award"; employees receiving a rating of "highly effective" "should normally receive a performance

6

award"; and employees receiving a rating of "effective" "should be considered for and may receive a performance award."  (DPR at 13.)  In the CRC, besides plaintiff, one other employee, an African-American female, received an "effective" rating and did not receive a bonus.  (2009 Bonus List.)  Plaintiff asserts that this employee did not receive a bonus due to her retirement. (Pl.'s Opp. at 25.)  Six additional employees – two African-American females, two Hispanic females, one white female, and one white male – received "effective" ratings and received bonuses.  (2009 Bonus List.)

### C.  Hostile Work Environment

Plaintiff alleges that Patricia Lamond "yelled at her at the top of her lungs in front of other employees."  (Ramseur Decl. ¶ 26.)  In her deposition, plaintiff was able to recall three such yelling incidents, although only two are included in the parties' submissions.  (Def.'s Mot., Ex. 12 [ECF No. 32] ("Ramseur Dep.") at 106.)  In one incident, on November 17, 2009, plaintiff alleges that Lamond "yelled at [her] unnecessarily" after plaintiff failed to make a copy of a document that Lamond had requested.  (Def.'s Mot., Ex. 11 [ECF No. 32] ("EEO Compl.") at 3; *see* Ramseur Dep. at 99-100.)  In another incident, on November 18, 2009, plaintiff alleges that Lamond yelled at her after plaintiff failed to give a fellow employee a message from Lamond.  (*See* EEO Compl. at 3; Ramseur Dep. at 98-99.)  Plaintiff claims that Lamond never yelled at white employees.  (EEO Compl. at 3; Ramseur Decl. ¶ 26.)  Julia Mankata-Tamakloe has stated that she recalls Lamond raising her voice with plaintiff, but not with any other employees.  (Mankata-Tamakloe Dep. at 43.)  Lamond agrees that she raised her voice with plaintiff, but she states she has a tendency to "raise[] [her] voice to office staff" when she "become[s] animated or excited" and that she "did not single out any particular individual." (Def.'s Mot., Ex. 16 [ECF No. 32] ¶ 3; *see* Def.'s Mot., Ex. 5 [ECF No. 31-1] at 100-01.)

Plaintiff maintains that several other incidents support her hostile work environment claim. On October 7, 2009, plaintiff asserts that Lamond reprimanded her for failing to tell another employee to attend a meeting, even though plaintiff claims that she did inform him of the meeting. (*See* EEO Compl. at 1; Ramseur Dep. at 102.) And plaintiff complains that Mata required her to leave a post-it note whenever she was away from her desk. (Pl.'s Opp., Ex. 21 [ECF No. 35-4] at 103-04.) She states that she never observed any other employees leaving post-it notes. (*Id.* at 104.) For her part, Mata has stated that she asked all CRC staff to inform the front desk receptionist if they planned to be gone for more than ten minutes or to leave a note on their cubicle if the front desk receptionist was gone, but that plaintiff "would often be away from her desk for more than 10 minutes at a time and would not notify anyone of her whereabouts." (Mata Aff. ¶ 29.)

## II.     PROCEDURAL HISTORY

On December 9, 2009, plaintiff submitted an "Informal Complaint Informational Form" to the CRC. (Pl.'s Opp., Ex. 19 [ECF No. 35-2].) On February 4, 2010, she filed a formal administrative complaint. An administrative judge dismissed her claims on April 18, 2012. (Def.'s Mot., Ex. 17 [ECF No. 32].)

On February 6, 2013, plaintiff filed an employment discrimination suit under Title VII. Count I of the complaint alleged that defendant engaged in an unlawful employment practice by including a requirement in the Staff Assistant position posting that disproportionately disqualified minority and/or women applicants and had no relation to the tasks expected to be performed. (Compl. ¶¶ 52-56.) Count II alleged that defendant retaliated against her by giving her a poor performance review and denying her a performance award, delaying the progress of her administrative claim, and subjecting her to a hostile work environment. (*Id.* ¶¶ 57-61.)

Count III asserted that plaintiff's conditions of employment – Lamond's "constant yelling," being "instructed . . . to leave sticky notes on her cubicle," the addition of the specialized experience requirement to the Staff Assistant position, and the improper procedure that was followed in denying her a performance bonus – amounted to a hostile work environment.  (*Id.* at 25-28.)  Finally, Count IV claimed that plaintiff had been the subject of "workplace bullying." (*Id.* at 28-29.)

Defendant moved for a judgment on the pleadings, which this Court granted in part and denied in part.  *Ramseur v. Perez*, 962 F. Supp. 2d 21 (D.D.C. 2013).  First, this Court held that Count I stated a sufficient disparate impact claim and that plaintiff had exhausted her administrative remedies related to that claim.  *Id.* at 26-27.  This Court also noted that Count I included a disparate treatment claim.  *Id.* at 28.  Second, the Court dismissed plaintiff's retaliation claims in Count II.  Her allegation of retaliation based on delays in processing her administrative claim failed because "there is no cause of action under Title VII for delay or interference in the administrative process."  *Id.* at 29.  The remainder of her retaliation claim failed to state a cause of action because the allegedly retaliatory incidents all occurred before plaintiff engaged in any protected activity.  *Id.* at 28-29.  Third, with respect to plaintiff's hostile work environment claim, Count III survived since the Court was "unable to conclude that the allegations in the complaint [were] deficient as a matter of law."  *Id.* at 30.  Fourth, "workplace bullying is not an independently cognizable claim under Title VII," and thus, the Court dismissed Count IV and said that it would "treat its allegations as part of . . . plaintiff's hostile work environment claim."  *Id.*

## ANALYSIS

## I.      STANDARD OF REVIEW

A motion for summary judgment is appropriate when the pleadings, the discovery, the disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute as to a material fact exists if a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). When considering a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. While summary judgment "must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Bolden v. Winter*, 602 F. Supp. 2d 130, 136 (D.D.C. 2009) (internal quotation marks omitted).

## II.    DISPARATE TREATMENT

Under Title VII, it is an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . [or] sex." 42 U.S.C. § 2000e-2(a). The "two essential elements" of a discrimination claim under this section are "that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, . . . [or] sex." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

Plaintiff correctly acknowledges that her allegations of disparate treatment are governed by the framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (Pl.'s Opp. at 14.)  "First, the plaintiff must establish a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  "In a . . . refusal-to-promote discrimination case, the *McDonnell Douglas* prima facie factors are that: (i) the employee 'belongs to a racial minority' or other protected class; (ii) the employee 'applied and was qualified for a job for which the employer was seeking applicants'; (iii) despite the employee's qualifications, the employee 'was rejected'; and (iv) after the rejection, 'the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.'"  *Brady v. Office of the Sergeant at Arms,* 520 F.3d 490, 493 n.1 (D.C. Cir. 2008) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).  Once plaintiff makes out a prima facie case, the burden shifts to defendant who must "articulate some legitimate, nondiscriminatory reason" for the adverse action.  *McDonnell Douglas Corp.*, 411 U.S. at 802; *see Reeves*, 530 U.S. at 142.

If defendant satisfies its burden, "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*."  *Reeves*, 530 U.S. at 142-43 (internal quotations marks and citations omitted); *see also Baloch*, 550 F.3d at 1197 n.2 ("In cases where the employee has suffered an adverse action and the employer has asserted a legitimate, non-discriminatory reason for that action, we do not consider the *McDonnell Douglas* prima facie factors.").  In such a situation, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of

11

race, color, religion, sex, or national origin?"  *Brady*, 520 F.3d at 494; *Lathram v. Snow*, 336

F.3d 1085, 1088 (D.C. Cir. 2003) ("[T]o survive summary judgment the plaintiff must show that

a reasonable jury could conclude from all of the evidence that the adverse employment decision

was made for a discriminatory reason.").

### A.  GS-11 Staff Assistant Position

Plaintiff asserts that she "was victimized by the insertion of a special placement factor

into the vacancy announcement for a GS-301-11, Staff Assistant [position]."  (Pl.'s Opp. at 10.)

She argues that the requirement that applicants have experience "conducting EEO and EO

investigations" "was never a requirement to qualify for a staff assistant position in the history of

the civil rights program at the Department of Labor."  (*Id.* at 11.)  Plaintiff contends that

"Lamond . . . drew the requirement and was assisted by Personnel Officer McAlpin in doing so."

(*Id.* at 16.)  Plaintiff alleges that DOL did not create a Job Analysis or a Crediting Plan for the

Staff Assistant position, and she argues that this procedural error "is evidence of disparate

treatment of a complainant."  (*Id.*)

Defendant's first response is that plaintiff has not made out a prima facie case of

discrimination because no one was hired for the position and the vacancy was not re-posted.

(*See* Def.'s Mot. at 15.)  To be sure, the fourth factor of the traditional *McDonnel Douglas* prima

facie case requires a plaintiff to show that "after [plaintiff's] rejection, the position remained

open and the employer continued to seek applicants from persons of complainant's

qualifications."  411 U.S. at 802.  The purpose of this element is "to eliminate non-selection

cases in which there was no available vacant position."  *Lewis v. District of Columbia*, 653 F.

Supp. 2d 64, 73 (D.D.C. 2009); *see also Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000) ("[The]

function [of the prima facie case] is limited to eliminating the two most common

nondiscriminatory reasons for a plaintiff's rejection: 'an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.'" (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977))).  Consequently, courts have dismissed cases where external factors rendered the position unavailable.  *E.g.*, *Hopkins v. Whipple*, 630 F. Supp. 2d 33, 38 (D.D.C. 2009) (summary judgment granted where government canceled position due to "changed workload and resulting lack of work for Russian interpreters"); *Carter v. Pena*, 14 F. Supp. 2d 1, 6 (D.D.C. 1997) (summary judgment granted where vacancies were canceled due to budgetary considerations).  But, the Supreme Court has cautioned that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  The D.C. Circuit has consequently "adopted a more general version of the prima facie case requirement: 'the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  Indeed, in *Chappell-Johnson*, the Circuit reversed a district court's grant of summary judgment for an employer even though plaintiff did "not attempt to show that the position remained open and that the employer continued to seek applicants," where plaintiff had produced other evidence to support an inference of discrimination in a failure-to-hire case.  *Id.*; *see also Lewis*, 653 F. Supp. 2d at 74 (concluding that a "categorical rule that the cancellation of a vacancy announcement can never give rise to a discrimination claim" is "contrary to existing law").

In the present case, plaintiff did not fail to secure the Staff Assistant position because of an "absence of a vacancy in the job sought." *Int'l Bhd. of Teamsters*, 431 U.S. at 358 n.44.  On the contrary, all of the evidence in the record suggests that plaintiff did not receive the job because she lacked the specified qualifications.  (*See* Brooks Nov. 19 E-mail (e-mail to plaintiff stating that she "did not qualify for the . . . position"); Brooks Aff. ¶ 30; Applicant Listing (noting that plaintiff was "missing specialized experience").)  Defendant concedes as much. (Def.'s SOF ¶ 17.)  The Court therefore cannot grant defendant's motion for summary judgment on the grounds that the position was never filled.

Defendant argues, in the alternative, that it had a "legitimate, non-discriminatory reason for [the] adverse employment action."  (Def.'s Mot. at 16 (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)).)  In particular, CRC management made clear to plaintiff that she was not given the position because she failed to meet the specified qualifications for the job.  (*See* Brooks Nov. 19 E-mail.)  The Supreme Court has noted that a plaintiff's "absolute or relative lack of qualifications" is one of the "two most common legitimate reasons on which an employer might rely to reject a job applicant." *Int'l Bhd. of Teamsters*, 431 U.S. at 358 n.44.  As such, defendant has carried its burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981) (noting that defendant must merely "set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection" and that "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons").

The question thus becomes whether plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of

race, color, [or] sex." *Brady*, 520 F.3d at 494.  The *Brady* Court listed a number of ways that a plaintiff could prove that an employer's stated reason was pretextual, *see id.* at 495, most of which plaintiff has failed to allege.  For instance, plaintiff has not put forward any "evidence suggesting that the employer treated other [applicants] of a different race, color, [or] sex . . . more favorably in the same factual circumstances." *Id.*  No applicant was ever hired for the position.[5]  (Brooks Aff. ¶ 30; Ramseur Dep. at 74.)  Moreover, plaintiff has not suggested that any of the applicants were treated differently from one another.  Similarly, plaintiff does not allege that there have been any "changes [or] inconsistencies in the stated reasons for the adverse action" or that there were any "discriminatory statements by the decisionmaker." *Brady*, 520 F.3d at 495 n.3.

---

[5] Plaintiff disputes CRC's contention that the position was never filled, arguing that that "[i]n 2010 . . . CRC detailed an Equal Opportunity Specialist to administrative duties in an administrative position with duties listed in the GS-11 position for which the Plaintiff had been determined unqualified.  In 2013, the agency created a position description, and reassigned the EOS to the position."  (Pl.'s Opp. at 28-29 (citations omitted).)  But the evidence plaintiff submits does not support her contention that the Equal Opportunity Specialist – who maintained a GS-12 grade – ever performed duties equivalent to the ones envisioned for the GS-11 position.  His performance evaluations from 2010 to 2013 do not indicate that he performed administrative tasks.  (*See* Pl.'s Opp., Ex. 37 [ECF No. 35-11] (describing investigative responsibilities).)  He was only assigned to an administrative position – as a GS-12 Administrative Specialist – in 2013, and the description for that position bears little resemblance to the description for the GS-11 Staff Assistant position.  (*Compare* Pl.'s Opp., Ex. 36 [ECF No. 35-10] ("Administrative Specialist Position Description"), *with* Vacancy Announcement.)  For example, the GS-12 Administrative Specialist position is tasked with "[u]tiliz[ing] the department's computer applications . . . to perform micro-purchases," "conduct[ing] market research for procurement requests," and "process[ing] requests for personnel security investigations."  (Administrative Specialist Position Description at 1-2.)  None of these was listed as responsibilities of the Staff Assistant position.  (*See* Vacancy Announcement.)  Since plaintiff provides no other evidence comparing the positions, her assertion that another employee was hired to fill the Staff Assistant position is contrary to the record.

Plaintiff's principal contention is that the specialized experience requirement, which disqualified her, was unrelated to the position.[6]  (*See* Pl.'s Resp. to Def.'s SOF ¶ 11 ("Neither, the Position Description nor the crediting Plan required performance of conducting investigations under EEO.").)  She argues that the "requirement to demonstrate experience in conducting investigations was never a requirement to qualify for a staff assistant position in the history of the civil rights program at the Department of Labor."  (Pl.'s Opp. at 11.)  The strongest support for her argument comes from the deposition of Julia Mankata-Tamakloe, who testified that "conducting civil rights investigations" is "not our staff assistant's duty."  (Mankata-Tamakloe Dep. at 26.)  Mankata-Tamakloe also testified that, when she was still working to create the Staff Assistant position, she did not suggest that applicants be required to have experience conducting civil rights investigations.  (*Id.*)  Plaintiff also cites her own declaration, which states that the investigative requirement had "never before [been] performed or required to be performed by GS-301 Series Staff Assistant positons of any grade in CRC or DOL wide and is currently not performed by the Staff Assistant position(s) today."  (Ramseur Decl. ¶ 1.) Finally, plaintiff argues that conducting investigations is a task "historically and presently performed by GS-Series 360-12 Equal Opportunity Specialists," whose duties include "conduct[ing] investigations/compliance assistance reviews under Federal statutes and DOL regulations."  (Pl.'s Opp. at 6; Pl.'s Opp., Ex. 14 [ECF No. 34-1].)

Nonetheless, the evidence submitted by plaintiff is insufficient to allow a reasonable jury to conclude that defendant fabricated its reason for plaintiff's non-promotion or that the true

---

[6] The full requirement reads as follows: "Specifically, candidates should demonstrate specialized experience in planning, implementing, or evaluating compliance and technical assistance activities related to recipients of Federal financial assistance; conducting EEO and EO investigations and non-discrimination statutes under Title VI and VII of the Civil Rights Act and related statutes."  (Vacancy Announcement at 3.)

reason was discriminatory.  To be sure, the *Brady* Court noted that one way a plaintiff could

prove that an explanation was pretextual was by "demonstrate[ing] that the employer is making

up or lying about the underlying facts that formed the predicate for the employment decision."

520 F.3d at 495.  "If the employer's stated belief about the underlying facts is reasonable in light

of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the

employer is lying about the underlying facts."  *Id.*; *see also Fischbach v. D.C. Dep't of

Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-

discriminatory explanation for its action . . . the issue is not the correctness or desirability of [the]

reasons offered . . . [but] whether the employer honestly believes in the reasons it offers."

(alterations in original) (internal quotation marks omitted)).

   There is little reason to think that CRC management fabricated the need for the

investigate requirement to cover up discriminatory animus.  Lamond testified that experience

conducting investigations was relevant to many of the duties of the newly created position.  (*See*

Pl.'s Opp., Ex. 16 [ECF No. 35-1] ("Lamond Dep.") at 74-81.)  These duties included: being

"[r]esponsible for administration and coordination of activities necessary to operate the

Director's immediate office, requiring a broad and intensive knowledge of procedure and

channels of authority within the [CRC]"; having "personal interface with people of all ranks and

degrees of importance and with widely diversified interests and problems"; "[p]articipat[ing], as

directed, in the development of justification for major projects for higher-level approval to

ensure emphasis between and among elements of the Divsions"; and "[k]eep[ing] abreast of the

DOL and Federal nondiscrimination regulations, policies, procedures, guidelines and processes

and keep[ing] director apprised of appropriate procedures and regulations."  (Pl.'s Opp., Ex. 10

[ECF No. 33-10] ("Position Description") at 2-3.)  Lamond stated that these and other duties of

the position "requir[ed] special knowledge of investigations or conducting investigations." (Lamond Dep. at 80.)

Plaintiff's and Mankata-Tamakloe's testimony that CRC staff assistant positions have not traditionally required knowledge of investigations does little to undermine Lamond's testimony, since no GS-11 staff assistant positions existed when CRC set about to create the position in October 2008. (*See* 2008 E-mail Exchange at 3.) Mankata-Tamakloe submitted a first draft of a new position description on November 21, 2008, but she stopped working on the position description at the end of December 2008. (*Id.* at 5; Mankata-Tamakloe Dep. at 33.) Mankata-Tamakloe's position description was subsequently revised. In particular, on February 9, 2009, Maria McAlpin,[7] a supervisor in the personnel department, e-mailed CRC management informing them that she had "made some changes to the staff assistant position" and that, in order to justify the GS-11 grade, "there must be some analytical and evaluation work included in [the position description]." (Def.'s Mot., Ex. 20 [ECF No. 32].) Defendant argues that CRC management modified the position description, including adding the specialized experience requirement, in response to McAlpin's comments. (Def.'s SOF ¶¶ 11, 13.) Regardless of whether the specialized experience requirement is directly attributable to McAlpin's comments, it is undisputed that the position's duties and requirements were modified and enlarged after Mankata-Tamakloe's involvement in the project ended. The Staff Assistant position was a novelty at the CRC, and it was reasonable for defendant to increase the job responsibilities of that position as compared to its lower-paid predecessor positions. As Lamond's testimony indicates, knowledge gained through conducting EEO and EO investigations would have been

---

[7] There is no evidence in the record that McAlpin knew plaintiff.

relevant to these expanded responsibilities.[8]  Plaintiff has thus failed to produce sufficient

evidence for a jury to conclude that CRC management inserted an investigative requirement as

pretext for a discriminatory motive.

Plaintiff nonetheless cites procedural irregularities in the hiring process, which she

contends are evidence of disparate treatment.  (Pl.'s Opp. at 16.)  To be sure, a plaintiff can

discredit an employer's stated reasons for an adverse employment action by "pointing to . . . the

employer's failure to follow established procedures or criteria." *Brady*, 520 F.3d at 495 n.3.

But, not every procedural violation can support an inference of pretext or discrimination. *See*

*Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) (noting that an employer's "failure . . .

to follow its own regulations and procedures, alone, may not be sufficient to support a finding of

. . . discrimination").  For example, in *Porter v. Shah*, 606 F.3d 809 (D.C. Cir. 2010), the D.C.

Circuit found that an overhaul of a position's crediting plan was not "particularly indicative of

discrimination or pretext" because "it affected all applicants equally and nothing in its text or

about its circumstances tie[d] it to discrimination or retaliation against [plaintiff] specifically."

*Id.* at 816.  The Court further held that "changing the job criteria was [not] 'so irregular or

inconsistent with [defendant's] established policies as to make its hiring explanation unworthy of

belief.'" *Id.* (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse*

*Servs.*, 165 F.3d 1321, 1330 (10th Cir.1999)).  As the D.C. Circuit recently said, "[e]ven if a

plaintiff 'was victimized by poor selection procedures,' [courts] may not 'second-guess an

employer's personnel decision absent demonstrably discriminatory motive.'" *Hairston v. Vance-*

*Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (quoting *Fischbach*, 86 F.3d at 1183); s*ee also*

---

[8] The investigative requirement could be particularly relevant to the duties of "[k]eep[ing]
abreast of the DOL and Federal nondiscrimination regulations" and "[p]articipat[ing] . . . in the
development of justification for major projects."  (Position Description at 3.)

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) (holding that "any possible procedural irregularities . . . were not enough to suggest gender bias" because the "irregularities . . . did not affect the final decision to deny [plaintiff] tenure"); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 n.9 (10th Cir. 2000) (holding that "where the alleged procedural irregularity disadvantaged all potential applicants for a promotion, rather than just members of a protected class, the fact that a company failed to follow its own procedures does not suggest either that the defendant's proffered reasons for its employment decisions were pretextual or that the defendant was motivated by illegal discrimination" (internal quotation marks omitted)); *Downing v. Tapella*, 729 F. Supp. 2d 88, 98 (D.D.C. 2010) (granting summary judgment to employer where there was no evidence that "the technical violation of GPO regulations was motivated by discrimination"); *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 312 (D.D.C. 2005) ("[A]lthough plaintiff's evidence may show the process to be imperfect, her evidence is not sufficient to establish that defendant's proffered explanation is pretextual absent some actual evidence that defendant acted on a motivation to discriminate against plaintiff based on her age, race or sex.").

Plaintiff's first procedural challenge is to argue that CRC did not produce a "legally mandated Job Analysis during discovery."[9]  (Pl.'s Opp. at 16.)  However, plaintiff has put forward no evidence that a job analysis was not completed for the position in question.  On the contrary, Mankata-Tamakloe stated that the CRC "did [the job analysis] with HR."  (Mankata-Tamakloe Dep. at 25-26.)  Moreover, even if CRC never completed a job analysis, that would

---

[9] Neither party explains what a "job analysis" is.  Based on Mankata-Tamakloe's deposition, this Court understands a job analysis as a description of the essential functions of the position. (Mankata-Tamakloe Dep. at 25.)

not be evidence of discrimination, since the failure to complete a job analysis in itself does not disparately disadvantage any one applicant. *See Porter*, 606 F.3d at 816.

Plaintiff also alleges that "the agency did not produce a crediting plan" for the position in question.[10] (Pl.'s Opp. at 16.) This assertion is flatly contradicted by the very deposition plaintiff cites to support her claim: Jackie Brooks testified that she worked with Ken Willis and others in creating the crediting plan. (*See* Brooks Dep. at 18-21.) Nowhere in the pages cited by plaintiff does Brooks "acknowledge[] that the agency did not produce a crediting plan." (Pl.'s Opp. at 16.) Brooks and CRC management discussed the proposed crediting plan extensively by e-mail. (*See* Def.'s Reply, Ex. 34 [ECF No. 37-2].) In an e-mail from Willis to Brooks, Willis quantifies the weights to be assigned to the various competencies. (*Id.*) And, the final Vacancy Announcement included a series of questions that appears to be a crediting plan. (*See* Vacancy Announcement at 7-11.) Finally, even if CRC made some procedural error in drafting a crediting plan, plaintiff has not explained how this evinces discriminatory intent, since such an error would affect all candidates equally.

In sum, plaintiff adduces no evidence to support an inference that the requirements were added to the job description so she would not be promoted and that this was motivated by discriminatory animus. Plaintiff has thus failed to undermine defendant's legitimate, nondiscriminatory reason for not promoting her: namely, that she was not qualified for the

---

[10] Neither party explains what a "crediting plan" is. Based on Brooks's deposition, the Court understands a crediting plan to be a series of questions to be answered by an applicant that relates to the competencies relevant to the position. (*See* Brooks Dep. at 17-21.)

position. The Court will therefore grant defendant's motion for summary judgment on plaintiff's

disparate treatment claim related to the Staff Assistant position.[11]

### B.  2009 Performance Appraisal and Bonus

Plaintiff also alleged that defendant retaliated against her for "complain[ing] of the

discriminatory disparate impact" by giving her a low performance rating and denying her a

bonus in November 2009.  (Compl. ¶ 58.)  This Court held that, since "plaintiff's first protected

activity occurred on December 9, 2009," and "the acts that she is complaining about all

occurred in November 2009," "it is factually impossible for plaintiff to prove causation as to

this retaliation claim." *Ramseur*, 962 F. Supp. 2d at 29.  Plaintiff, however, continues to

maintain that the 2009 appraisal and denial of a bonus support her hostile work environment

claim, addressed *infra*, and her discrimination claim.  (*See* Pl.'s Opp. at 27.)  In particular,

plaintiff alleges that the following facts demonstrate disparate treatment based on race and sex:

> Mata and or Lamond (1) DID NOT PROVIDE Plaintiff with a mandatory mid-
> year review, resulting in her having no knowledge that her appraisal was being
> downgraded by two levels; (2) did not consider the Plaintiff's submissions of
> work accomplishments before downgrading the appraisal; (3) did not consult with
> prior supervis[or] in the rating of record, thus disregarding ½ of the work
> performed in the rating period; (4) altered written request from the Plaintiff to
> meet and confer on the rating; (5) altered the location on the appraisal form at
> which the Plaintiff indicated a desire to submit comments; (6) ignored two written
> requests [f]rom the Plaintiff to meet to discuss the appraisal (Rating of Record);
> (7) and by-passed the Plaintiff by submitting the appraisal to the official custodian
> of records of performance.

(Pl.'s Opp. at 27-28.)

"[L]oss of bonus money because of an improperly low performance rating may constitute

an adverse employment action for the purposes of Title VII." *Taylor v. Small*, 350 F.3d 1286,

---

[11] Since the Court is granting defendant's motion for summary judgment with respect to all of
plaintiff's claims, there is no need to resolve defendant's argument that plaintiff failed to exhaust
her allegations of discrimination based on sex.  (*See* Def.'s Mot. at 24-26.)

1293 (D.C. Cir. 2003). Defendant has asserted that the performance rating and concomitant denial of bonus money were due to plaintiff's performance. (Mata Aff. ¶ 25.) In particular, Elvia Mata claims that the rating was based on plaintiff's "execution of assignments," "customer service," "display of tact, discretion, and confidentiality," "ability to seek possible sources for information when it is not [readily] available to her," "final product reflect[ing] information requested," and "accepting personal responsibility for the quality of her work." (*Id.* ¶ 20.) Mata further cites six specific instances between March and October 2009 when she spoke to plaintiff about her behavior or the quality of her work. (*Id.* ¶ 18.) For example, Mata reports talking to plaintiff about photocopying a book using government property, failing to follow instructions in placing particular dates on the Director's calendar, and including erroneous information in a document sent out to CRC staff. (*Id.*) This explanation is sufficient to satisfy defendant's burden of producing a legitimate, nondiscriminatory reason for giving plaintiff an "effective" rating. And, DOL guidelines provide that employees receiving an "effective" rating are not necessarily entitled to a bonus. (DPR at 13.) Defendant has thus carried its burden to produce a legitimate, nondiscriminatory reason for denying plaintiff a bonus.

It is therefore incumbent upon plaintiff to show that the "employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, [or] sex." *Brady*, 520 F.3d at 494. Plaintiff provides scant evidence on this score. First, plaintiff contends that she "was the sole active employee [in the CRC] who did not receive a bonus," which plaintiff argues "suggests disparate treatment." (Pl.'s Opp. at 24.) This fact, even if true,[12] cuts against plaintiff. Six employees in

---

[12] One other employee, an African-American female, also did not receive a bonus in 2009. (2009 Bonus List.) Plaintiff claims that she did not receive a bonus due to retirement. (Pl.'s Opp. at 25.)

the CRC, including two African-American females and two Hispanic females, received an

"effective" rating and also received a bonus.  (*See* 2009 Bonus List.)  Seventeen African-

American and nineteen female CRC employees received a "highly effective" or "exemplary"

rating, and presumably these individuals would have received bonuses under the DOL policy in

effect at the time.[13]  (*Id.*)  These facts cast doubt on plaintiff's contention that either race or sex

was the motivating factor driving the rating and bonus decisions.

Next, plaintiff argues that the fact that she "receiv[ed] highly rated performance reviews

greater than 'effective' throughout [her 30 years at DOL] . . . suggests that the . . . reviewer

possessed some animus directed at the Plaintiff . . . and suggests that Race and Gender *could*

have affected their assessments."  (Pl.'s Opp. at 24 (emphasis added).)  However, as Mata

explains, "employees are evaluated for the work they accomplished within the rating period of

their evaluations."  (Mata Aff. ¶ 24.)  Plaintiff's receipt of better appraisals in the past does not

suggest that her 2009 rating was a pretext, particularly where CRC management cited numerous

complaints about plaintiff's performance during that period that plaintiff does not dispute.  (*See*

Mata Aff. ¶ 18; Def.'s SOF ¶ 22; Pl.'s Resp. to Def.'s SOF ¶ 22; Ramseur Decl. ¶ 22.)

Moreover, it is well established that a drop in performance rating does not, without more, give

rise to an inference of discrimination.  *Xuelin Zhuang v. Datacard Corp.*, 414 F.3d 849, 855 (8th

Cir. 2005) (rejecting argument that drop in performance rating evinces pretext); *Carpenter v.

Fannie Mae*, 174 F.3d 231, 236 (D.C. Cir. 1999) (same); *Danzer v. Norden Systems, Inc.*, 151

F.3d 50, 56 (2d Cir. 1998) (same).  This Court will not "second-guess [CRC's] personnel

decision absent demonstrably discriminatory motive."  *Fischbach*, 86 F.3d at 1182 (internal

---

[13] Indeed, plaintiff asserts the following: "In 2009, at the time of bonus payouts, the Civil Rights
Center employed 43 employees. Forty-two active employees received bonuses, and 1 employee,
the Plaintiff did not."  (Pl.'s Opp. at 25.)

quotation marks omitted); *see also Adeyemi*, 525 F.3d at 1227 (judiciary is not a "super-personnel department that reexamines an entity's business decisions" (internal quotation marks omitted)); *Carpenter*, 174 F.3d at 236 ("[A]bsent 'error too obvious to be unintentional,' court respects employer's 'unfettered discretion' to evaluate employees." (quoting *Fischbach*, 86 F.3d at 1183)); *Allen v. Napolitano*, 943 F. Supp. 2d 40, 48 (D.D.C. 2013) ("[T]o survive summary judgment, [plaintiff] cannot merely show that the rating she received was subject to reasonable dispute; such a showing  would thrust the Court and jury into the role of a super-personnel department determining the optimal evaluation of an employee years after the fact."); *Ma v. Westinghouse Elec. Co.*, No. 2:11-cv-970, 2013 U.S. Dist. LEXIS 59811, at *16 (W.D. Pa. Apr. 26, 2013) ("[I]t is well-established that an employee's mere disagreement with her performance evaluation does not prove pretext.  This Court will not second-guess the managerial judgments of employers."), *aff'd* 559 F. App'x 165 (3d Cir. 2014).

In an attempt to overcome this case law, plaintiff alleges that CRC management made a number of procedural errors in handling her 2009 appraisal.  The Court finds that these allegations are either not supported by the record or are not "so irregular or inconsistent with [defendant's] established policies as to make its . . . explanation unworthy of belief."  *Porter*, 606 F.3d at 816 (internal quotation marks omitted).  For example, plaintiff alleges that defendant "did not consider the Plaintiff's submissions of work accomplishments before downgrading the appraisal."  (Pl.'s Opp. at 27-28.)  However, Mata has testified that plaintiff's additional submissions were reviewed and simply did not justify a higher rating.  (Mata Aff. ¶ 27.)  Plaintiff has given no reason to doubt Mata's account, and plaintiff's own e-mail indicates that Mata requested one of the submissions.  (*See* Ramseur Oct. 28 E-mail.)  Plaintiff also argues that CRC management "did not consult with prior supervis[ors] in the rating of record, thus disregarding ½

of the work performed in the rating period." (Pl.'s Opp. at 28.) But Lamond and Mata became

plaintiff's supervisors in March 2009, and the rating period began on March 23, 2009 (*see* Def.'s

SOF ¶¶ 3-4; Pl.'s Resp. to Def.'s SOF ¶¶ 3-4; 2009 Performance Review), so her prior

supervisors' input would not have been relevant. Plaintiff contends that CRC did not provide her

"with a mandatory mid-year review." (Pl.'s Opp. at 27; *see* 2009 Performance Review.)

Although DOL guidelines do call for mid-year "progress reviews" (DPR at 5), four other CRC

employees (two Hispanic females, one African-American male, and one Caucasian female) also

did not receive mid-year reviews, and all received bonuses.[14] (*See* 2009 Bonus List.) There is

thus no evidence that the failure to receive a mid-year review affected plaintiff's appraisal or

bonus, and it does not undermine defendant's nondiscriminatory explanation.[15] *See Weinstock*,

224 F.3d at 45. Plaintiff also claims that she "informed Ms. Mata that she wished to submit

comments to her rating," but that "Ms. Mata and Patricia Lamond signed the 'effective' rating,

not allowing comments and somebody blacked out the check box that Plaintiff had marked to

signify that she had comments to include." (Pl.'s Opp. at 22; *see also* Ramseur Decl. ¶ 21.) The

record contradicts plaintiff's assertion that she was prevented from submitting materials related

to her appraisal.[16] Plaintiff e-mailed supportive documents to Mata both before and after her

---

[14] One other employee did not receive a mid-year review and did not receive a bonus, but plaintiff attributes that employee's failure to receive a bonus to retirement. (*See* 2009 Bonus List; Pl.'s Opp. at 25.)

[15] Moreover, even if CRC did not conduct an official mid-year review, plaintiff concedes that Mata met with her on several occasions during the appraisal period to discuss performance issues. (Def.'s SOF ¶ 22; Pl.'s Resp. to Def.'s SOF ¶ 22.)

[16] Plaintiff does not explain how Lamond and Mata prevented her from submitting comments. Plaintiff states that she "was never provided an opportunity to submit comments on the appraisal before it was sent to the personnel office, although she demanded an opportunity to do so in writing on two occasions." (Pl.'s Resp. to Def.'s SOF ¶ 21.) But DOL regulations put the onus of submitting comments on the employee. (*See* DPR at 7 (providing that, after the rating official

evaluation.  (*See* Ramseur Oct. 28 E-mail; Ramseur Oct./Nov. E-mails.)  Mata claims that she

reviewed these documents and attached the post-rating submissions to plaintiff's performance

management plan, but that they did not change plaintiff's rating.  (*See* Mata Aff. ¶¶ 23, 27.)

Moreover, even if plaintiff was deterred from submitting comments (as opposed to documents),

she has not argued that those comments would have affected her appraisal.  *See Weinstock*, 224

F.3d at 45.  Regarding the "black[] out" on her appraisal, plaintiff has produced insufficient

evidence to show that it was "so irregular or inconsistent with [defendant's] established policies

as to make its . . . explanation unworthy of belief."[17]  *Porter*, 606 F.3d at 816 (internal quotation

marks omitted); s*ee also Forman v. Small*, 271 F.3d 285, 291 (D.C. Cir. 2001) ("Consistent with

the courts' reluctance to become involved in the micromanagement of everyday employment

decisions, the question before the court is limited to whether [plaintiff] produced sufficient

evidence of . . . discrimination, not whether he was treated fairly . . . ." (citations omitted)).

---

gives the employee the initial appraisal, the employee "will be allowed up to five work days to
respond in writing to the recommended rating").)  Plaintiff received her initial appraisal on
October 29, 2009.  (*See* 2009 Performance Review; Ramseur Oct./Nov. E-mails.)  There is no
evidence in the record that plaintiff ever submitted any comments to her appraisal other than the
supportive documents she e-mailed to Mata.  On November 9, 2009, plaintiff did send an e-mail
to Mata asking to add written comments on her performance appraisal.  (Ramseur Oct./Nov. E-
mails.)  This e-mail did not contain comments.  Moreover, it came more than five business days
after her initial rating, and by that time Mata had already forwarded her review to Lamond, who
signed it on November 5, 2009.  (2009 Performance Review; *see* DPR at 7 ("If no comments are
provided within five days, the rating official will proceed with forwarding the appraisal to the
higher-level reviewing official.").)  As such, plaintiff's allegation that CRC did "not allow[]
comments" on the appraisal lacks support in the record.

[17] Neither party explains why the form was changed or what affect the change had, if any.
Contrary to plaintiff's allegations, the form still appears to indicate that plaintiff had comments
to attach.  (*See* 2009 Performance Review.)  There is certainly no reason to believe that the
change prevented plaintiff from submitting comments, as provided by DOL regulations.  *See
supra* note 16.  Plaintiff has therefore failed to articulate how the alteration was inconsistent with
any of CRC's policies.

In sum, defendant has alleged a legitimate, nondiscriminatory reason for its employment action: namely, that plaintiff's job performance was lacking.  Plaintiff has conceded that CRC management met with her on several occasions to discuss work-related problems and that other individuals of her race and sex received better performance reviews and bonuses.  She has identified several procedural problems with the CRC appraisal process, but to the extent that those complaints are valid, they do not suggest that the reasons given for her appraisal were phony or that the true reason was discriminatory.  Therefore, the Court will grant defendant's motion for summary judgment with respect to plaintiff's claim of disparate treatment related to the 2009 performance appraisal and bonus.

## III.    DISPARATE IMPACT

"[F]acially neutral employment practices that have significant adverse effects on protected *groups* have been held to violate [Title VII] without proof  that the employer adopted those practices with a discriminatory intent." *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 986-87 (1988).  "The evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Id.* at 987.

Plaintiff alleges that the job requirement for the GS-11 Staff Assistant position was a facially neutral policy that disproportionately disqualified females and African-Americans.  (*See* Compl. ¶¶ 20-24, 52-56.)  To support this claim, she points to the distribution of applicants – seven African-Americans and one Caucasian; all women – none of whom were selected for the position.  (*See id.* ¶ 20; Pl.'s Opp. at 19; Pl.'s Opp., Ex. 25 [ECF No. 35-6].)  Plaintiff also cites a 2009 DOL report showing that 582 of 1334 administrative support staff positions were held by African-American women.  (*See* Pl.'s Opp., Ex. 33 [ECF No. 35-7].)  Plaintiff submits no further

evidence to support her disparate impact claim; in particular, she withdrew her only expert prior to his deposition.  (*See* Def.'s Mot., Ex. 14 [ECF No. 32].)  Defendant contends that plaintiff's disparate impact evidence is insufficient to survive summary judgment because she "provided no statistical evidence, whatsoever, to support her claim."  (Def.'s Mot. at 7.)

Courts have consistently required statistical evidence to prove a disparate impact claim. *See Watson*, 487 U.S. at 994 ("Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."); *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1085-86 (D.C. Cir. 2011) ("When presenting a disparate impact claim, a plaintiff must generally demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group." (internal quotation marks omitted));  *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984) ("Statistical evidence is crucial in disparate impact cases . . . .").  The Supreme Court has specifically warned against "small or incomplete data sets."  *Watson*, 487 U.S. at 996-97.

Plaintiff has failed to offer statistical evidence upon which a reasonable jury could infer that the job requirement disproportionately disqualified African-Americans or women.  The imbalance in job applicants is not itself probative as to whether the job requirement disparately impacted a protected group, since not a single applicant was selected for the position.  In *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), the Supreme Court articulated plaintiff's burden in establishing a prima facie case of disparate impact discrimination: the plaintiff must "show[] that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants."  *Id.* at 425.  Since every applicant was

rejected, the mere fact that more African-Americans and women applied for the job does not itself show that job requirement filtered out applicants "in a . . . pattern significantly different from that of the pool of applicants." *Id.* And, plaintiff does not explain how her other piece of evidence – that 43% of administrative support staff positions at the DOL are held by African-American women – is relevant to the question of whether the job requirement for the GS-11 Staff Assistant position disproportionately impacted African-Americans or women.[18] Since plaintiff has failed to offer any statistical evidence showing that African-Americans or women would be especially disadvantaged by the specialized experience requirement, the Court will grant defendant's motion for summary judgment on the disparate impact claim.

## IV.     HOSTILE WORK ENVIRONMENT

Plaintiff alleges that the conduct of her supervisors, Lamond and Mata, subjected her to a hostile work environment.[19] In particular, she alleges that the following actions created a hostile work environment: (1) "[t]he manipulation by Lamond of [the] advertisement and selection process [for the GS-11 Staff Assistant position]"; (2) the "disregard of mandatory policies" and "pre-determination of rating without consideration of employee input" with respect to plaintiff's performance appraisal in November 2009; (3) "Patricia Lamond yell[ing] at [plaintiff] at the top

---

[18] In particular, this statistic does not shed light on any of the data that might be relevant to plaintiff's disparate impact claim, such as the total number of African-Americans or women qualified for the Staff Assistant position or the total number of such individuals who would have been rejected based on the job requirement at issue. *See Metrocare v. Wash. Metro. Area Transit Auth.*, 679 F.2d 922, 930 (D.C. Cir. 1982) ("[T]he statistics must compare the percentage of blacks hired for given jobs with the percentage of blacks qualified for those positions.").

[19] Plaintiff's complaint implies that the hostile work environment was retaliatory. (Compl. at 25 ("In Retaliation against the Plaintiff for speaking out against the denial of a promotion opportunity . . . .").) However, as this Court noted in its previous Opinion, "plaintiff's first protected activity occurred on December 9, 2009." *Ramseur*, 962 F. Supp. 2d at 29. All of the allegedly hostile treatment occurred before that time. As such, plaintiff's hostile work environment allegations can only be based on discrimination.

of her lungs in front of other employees on several occasions in 2009"; (4) Lamond and Mata

"blam[ing] . . . Plaintiff for dereliction of duty" in failing to inform another employee of a

meeting when "she had indeed informed [him] about the meeting"; and (5) being "the only

employee during the period 2008-2010 who was instructed to place post-it notes at her desk

every time she was away from her work station."  (Pl.'s Opp. at 21-27.)

To prevail on a hostile work environment claim, "a plaintiff must show that h[er]

employer subjected h[er] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment.'"  *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S.

17, 21 (1993)).  "To determine whether a hostile work environment exists, the court looks to the

totality of the circumstances, including the frequency of the discriminatory conduct, its severity,

its offensiveness, and whether it interferes with an employee's work performance."  *Id.*

"[C]onduct must be extreme to amount to a change in the terms and conditions of employment . .

. ."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  This standard is "demanding to

ensure that Title VII does not become a 'general civility code.'"  *Id.*  "[S]imple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the terms and conditions of employment."  *Id.* (internal quotation marks omitted).

With respect to Lamond's handling of the Staff Assistant position selection process, the

Court has already explained that there is no evidence in the record indicating that the specialized

experience requirement was added to discriminate against plaintiff or was racially or sexually

motivated.  *Supra* Section II.A; *see also Na'Im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)

("Courts in this jurisdiction have routinely held that hostile behavior, no matter how unjustified

or egregious, cannot support a claim of hostile work environment unless there exists some

31

linkage between the hostile behavior and the plaintiff's membership in a protected class."). Moreover, defendant's failure to promote plaintiff was not a form of "discriminatory intimidation, ridicule, [or] insult" that could give rise to a hostile work environment claim. *Harris*, 510 U.S. at 21 (internal quotation marks omitted).

The denial of a bonus also cannot contribute to plaintiff's hostile work environment claim. Defendant has provided legitimate, nondiscriminatory reasons for giving plaintiff an "effective" rating and denying her a bonus, which plaintiff has failed to rebut. *Supra* Section II.B; *see also Baloch*, 550 F.3d at 1201 (finding no hostile work environment where there were "legitimate reasons and constructive criticism offered in . . . letters of counseling and reprimand"). And, there is no evidence that, in delivering plaintiff's performance review, Lamond or Mata were abusive or hostile. *See Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (finding no hostile work environment where plaintiff's "performance reviews . . . d[id] little to evince abusive conditions"). Plaintiff's allegations related to her 2009 appraisal, therefore, cannot contribute to her hostile work environment claim. *See Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("Nor can the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management be characterized as sufficiently intimidating or offensive in an ordinary workplace context.").

Plaintiff's remaining complaints do not sustain a claim of discriminatory hostile work environment. Viewing the facts in the light most favorable to plaintiff, there is evidence that plaintiff was yelled at three times in front of her coworkers, that plaintiff was singled out to leave post-it notes on her cubicle during long breaks, and that plaintiff was once reprimanded without cause. The Supreme Court has made clear that Title VII does not reach the "ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, and the D.C. Circuit has rejected allegations more

severe than plaintiff's.  For example, in *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), the

Circuit upheld summary judgment for an employer where a black woman from Trinidad and

Tobago was "told by three separate employees to 'go back to Trinidad' or to 'go back to where

[she] came from,'" where her "co-workers shouted at her, told her that she should never have

been hired, and told her to 'shut up.'"  *Id.* at 408 (alteration in original).  These comments are

substantially more abusive and hostile than the conduct alleged here.  *See also Singh v. U.S.*

*House of Representatives*, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004) (finding no hostile work

environment where an employer "humiliated [plaintiff] at . . . meetings," screamed at her in one

instance, "told her to 'shut up and sit down'" in another instance, and treated her in a manner that

was "constantly hostile and hypercritical").  Plaintiff alleges that Lamond yelled at her three

times, but she does not suggest that Lamond ever attacked her personally, said anything abusive

or hostile, or uttered any racial slurs.  *See Singh*, 300 F. Supp. 2d at 56 ("Criticisms of a

subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the

kinds of normal strains that can occur in any office setting . . . .").  Her other allegations – that

she was required to leave post-it notes on her cubicle and that she was reprimanded once without

cause – are likewise the sort "ordinary tribulations of the workplace" that fall outside of Title

VII's purview.  *Faragher*, 524 U.S. at 788.  In short, plaintiff has failed to show that her

employer subjected her to "discriminatory intimidation, ridicule, and insult" that was

"sufficiently severe or pervasive to alter the conditions of [her] employment and create an

abusive working environment."  *Harris*, 510 U.S. at 21 (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the Court will grant defendant's motion for summary judgment [ECF No. 30].  An Order consistent with this Memorandum Opinion will be issued on this day.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   February 18, 2015